IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROSE DuBOSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 12-cv-789-DGW |
| | ) |
| JOHN M. McHUGH, Secretary of the Army | ) |
| and DEPARTMENT OF THE ARMY, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' TRIAL BRIEF**

NOW COME Defendants, John M. McHugh, Secretary of the Army, and the Department of the Army, by and through their attorneys, Stephen R. Wigginton, United States Attorney for the Southern District of Illinois, and Nathan D. Stump, Assistant United States Attorney, and file this trial brief to assist the Court in preparation for trial and to identify potential issues that may arise and require attention during the course of the trial.

**I.     NATURE OF THE CASE**

This is an action for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq*. The Plaintiff, Rose DuBose, previously worked for the Army at Fort Eustis, Virginia. In 2010, she interviewed for a higher position at Scott Air Force Base, Illinois, but the Army chose instead to hire another candidate named Bryan King. Ms. DuBose maintains that she was the most qualified candidate and that the Army decided not to hire her because she had previously complained of unlawful discrimination in 2008. She claims that the Defendants' conduct caused her significant economic and non-economic damages.

The Defendants are the United States Army and the Secretary of the Army, John McHugh. Mr. McHugh is the only proper defendant (*see* 42 U.S.C § 2000e-16), and he is being sued only in his official capacity, so he will not be in attendance during the trial. The Defendants deny that they unlawfully retaliated against Ms. DuBose. They maintain that Mr. King was the superior candidate and that Ms. DuBose was not chosen because she did not perform as well in her interview. The Defendants assert that Ms. DuBose is not entitled to any financial recovery.

**II.     JURISDICTION**

This is an action for damages and injunctive relief. The Plaintiff alleges retaliation in violation of Title VII and seeks the following relief:

(1) an order requiring the Defendants to institute and carry out policies, practices and programs which provide equal employment opportunities to qualified individuals and which eradicate the effects of past and present unlawful employment practices;

(2) an order requiring the Defendants to make Plaintiff DuBose whole with payment of all pecuniary losses suffered as a result of the events set forth in the Complaint, in amounts to be proved at trial;

(3) an order requiring the Defendants to make Plaintiff DuBose whole by providing compensation for all non-pecuniary damages including compensation for emotional pain, suffering, inconvenience, mental anguish, loss of quality of life, loss of enjoyment of life, loss of reputation and loss of career and humiliation in amounts to be proved at trial;

(4) an order requiring the Defendants to pay Plaintiff DuBose's reasonable attorney's fees, expert fees and costs incurred in bringing and prosecuting this action; and

(5) pre-judgment and post-judgment interest, as applicable.

The jurisdiction of the Court is not disputed. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e(5) (jurisdiction over Title VII cases); 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 1343 (jurisdiction over civil rights cases).

## III. FACTS

The defendants anticipate that the evidence at trial will establish the following:

1. The Plaintiff began her employment with the Army in 1984. Her first position was as a **Computer Programer Analyst** (GS-7), making approximately $17,000 per year. She retired in 2010 as a **Supervisory Information Systems Manager** (GS-15), earning an annual salary of over $132,000. Throughout her 26-year tenure, DuBose worked in the field of Information Technology, where she received regular promotions, bonuses and pay increases. Her performance evaluations were good.

2. In 2002, DuBose worked as a **Supervisory Information Management Specialist** (GS-13) for the Army's Surface Deployment and Distribution Command (SDDC), located at Fort Eustis, Virginia. She applied but was not selected for a promotion to a GS-14 position; instead, a white female was chosen. DuBose filed an EEO complaint and in March 2003 was promoted to **Information Technology Specialist** (GS-14).

3. Beginning in 2005, the Army was engaged in a lengthy process of relocating all SDDC employees from Virginia to Scott Air Force Base, Illinois. Rather than relocate, some employees simply retired. Other jobs were discontinued. The Army offered DuBose the option of requesting a transfer to Scott AFB. At the time, she was still working as an **Information Technology Specialist** (GS-14) for SDDC at Fort Eustis. In September 2006, she formally requested and was later awarded a position as a **Supervisory Resource Manager** (GS-14) with SDDC at Scott AFB. The new position would have paid the same amount as her old job.

4. Sometime later in 2007, even though she had been awarded the very job she requested, DuBose changed her mind and notified the Army that she would rather remain at Fort Eustis. Accordingly, the Army canceled her transfer and opened the Supervisory Resource Manager position at Scott AFB for competition.

5. The Army accommodated DuBose by allowing her to remain at Fort Eustis, at her request, as a **Supervisory Information Technology Specialist** (GS-14). Because SDDC was closing its operations at Fort Eustis, the new position was only temporary and set to expire on September 30, 2010, or whenever the Fort Eustis operations were finally closed, whichever was earlier. DuBose signed a memo acknowledging that the position was temporary, that she would no longer be eligible for priority placement within the DOD, and that she would be "terminated at the expiration of the term appointment."

6. DuBose accepted the term appointment because she was close to retirement and she believed that her benefits would be fully vested by the end of September 2010. Her plan was to remain at Fort Eustis and retire when her position expired. But sometime after she accepted the term position, she realized that her calculations were wrong and she would need to work until December of 2011 to maximize her retirement benefits, so she began seeking out ways to extend her employment with the Army.

7. In 2008, DuBose applied to be a **Supervisory Information Systems Manager** (GS-15) at Scott AFB. The position represented a promotion for DuBose and would have made her Chief of the Network Management Division. Other Army employees applied for the position as well. The Plaintiff's immediate supervisor, Judith Beussink, SDDC's Deputy Chief Information Officer, served on the interview panel and as the selection official. The Army ultimately chose Donald Broadbent, a white male, for the position.

8. DuBose subsequently submitted a complaint of discrimination based on race, age, and gender, alleging that Broadbent had been unfairly pre-selected for the job. The parties eventually settled the matter in November 2008, and as a result of the settlement, the Army agreed to convert DuBose's temporary position at Fort Eustis from Supervisory IT Specialist (GS-14) to **Supervisory Information Systems Manager** (GS-15). This resulted in a 6% increase in her base salary. Her position, however, remained set to expire on September 30, 2010.

9. In January 2010, DuBose received a positive annual performance evaluation from her supervisor, Judith Beussink, who rated DuBose 3.35/5, which qualified DuBose for both a salary increase and a bonus. "In the area of IT supprt," Beussink wrote, "Ms. DuBose exemplifies the command mantra of committed, dependable, and relentless." But Beussink also noted that DuBose had some room for improvement, particular when it came to managing other employees:

> Rose has a very challenging job, with lots of serious personnel issues. She is totally dedicated and fully committed to doing the best job possible and should be recognized accordingly for this effort. However, on occasion she often allows emotion to influence her interactions with people resulting in bad outcomes for the Command. This is an area Rose should focus [on] during the next cycle.

10. In June 2010, DuBose applied for a permanent position at Scott AFB as a **Supervisory Information Systems Management Specialist** (GS-15) . The selected candidate would serve as the Chief of the Programs and Technology Division of SDDC. Contrary to her allegations in the Complaint, this was a job that DuBose had never held. While it overlapped to some degree with her job, it was a higher-level position that had formerly been held by Roland Tanner at Scott AFB (from 2007-2009) and Stephen Schmitt in Alexandria, Virginia (from 2005-2007).[1]

11. Other Army employees applied for the position as well, including Beussink's supervisor, **Cpt. Robert Little**, who was then the Deputy to the Commander for Information Management, and **Bryan King**, who was then the Chief of the Technology Branch – one reporting level below the position at issue. In fact, the position had been vacant for over a year, and during that time King had taken on many of its associated responsibilities.

12. In 2010, whenever a position was open for competition, the Army used an automated computerized process to screen all candidate resumes for basic qualifications. The computer would look for keywords. Resumes that failed to include a certain number of the designated keywords were automatically rejected. Applicants who believed their resumes were rejected in error could request a manual review by an employee of the Army's human resources department.

13. On June 2, 2010, the computer referred 30 candidates for the position. Bryan King's resume was rejected by the automated screening process, and so, on his own initiative, King followed the procedure for requesting a manual review. As a result of the manual review, his resume was accepted, and a revised list of 31 candidates was forwarded to the selection official for consideration one week later, on June 9, 2010.

14. A panel consisting of **Beussink** (Deputy Chief Information Officer at SDDC), **Col. David Vega** (Chief of the Mobility Systems Division at Air Mobility Command), and **Carolyn Hope McMahon** (Chief of the Capabilities and Support Division at US Transportation Command) independently reviewed all of the resumes and rated them from 0 to 4 in the following five categories:

- Knowledge and experience in funding/budgeting in Information Technology.

- Demonstrated ability to manage a wide array of CIO competencies.

- Leading a complex IT infrastructure and/or development project/program through all phases.

- Knowledge of SDDC, TRANSCOM, Army, and DoD IT policies, regulations, practices, technical/system architectures, and transportation business processes.

- Demonstrated ability to effectively communicate orally and in writing to seniors, peers, and subordinates.

---

[1] This can be proven definitively, as each job in the Army has a Position Description (PD) number associated with it. The PD number for the position in question was 107929. DuBose was never assigned to that position.

4

15. Each panel member completed a rating sheet for each resume. Vega and McMahon both gave their second-highest scores to DuBose. Beussink ranked DuBose 11th, noting that she managed a very small budget compared with other candidates and that she did not reference experience with capital funds, which comprised 99 percent of the organization's money. Beussink also observed that DuBose did not have many references to DoD, TRANSCOM, or Army IT policies and practices, or to interactions with senior leaders, and there were a few spelling errors on her resume.[2]

16. The panel members each submitted their scores to **Col. Stanley Wolosz**, the selection official, without ever conferring with each other or comparing notes. Based on the total scores below, Col. Wolosz selected these five candidates for interviews:[3]

    47  Samuel Douglas
    45  Bryan King
    43  Rose DuBose
    43  Mark Lovejoy
    40  Robert Little.

17. The interviews were all conducted on the afternoon of June 28, 2010, by the three members of the resume review panel and Col. Wolosz. At the time, DuBose was on vacation in Venice, Italy. The Army afforded her the opportunity to interview by phone, and she accepted. Her interview began at approximately 1:00 p.m. CT, which was 8:00 p.m. in Italy. She was the only candidate who interviewed by phone. The other four candidates appeared in person at Scott AFB.

18. During the interviews, the panel members took turns asking each of the five job candidates the same eight questions. Each panel member independently scored the candidates' answers on a scale of 0 to 4, with a "0" indicating "no experience" and a "4" signifying a "superior response." At the end of each interview, the panel members discussed how well they thought the candidate had answered the questions. When all of the interviews were finished, the panel members went around the table adding up the scores for each candidate.

19. At no time before, during, or after the interviews did the panel members discuss any candidate's race, gender, age, disability, or prior protected activity. DuBose's prior EEO complaints were never mentioned by anyone.

20. All four interviewers gave their highest interview score to Bryan King. All four interviewers gave their lowest interview score to DuBose. This is a breakdown of the final scores:

---

[2] These were the resume scores. In its ruling on the defendants' motion for summary judgment, the Court mistakenly identified them as the interview scores. *See* Doc. 35 at 9.

[3] Col. Wolosz did not personally review any of the resumes; he merely considered the scores. To account for the fact that some panel members scored the resumes more generously than others, he considered not only the total scores but also whether a resume received a top-five score from more than one panel member. Accordingly, one applicant who scored higher than Little (Kathleen Clore) was nonetheless not chosen for an interview.

| Candidate | Vega[4] | McMahon | Beussink | Wolosz | **Total** |
|---|---|---|---|---|---|
| King | 22 | 28 | 29 | 31 | **110** |
| Little | 18 | 26 | 29 | 31 | **104** |
| Douglas | 22 | 17 | 22 | 27 | **88** |
| Lovejoy | 21 | 19 | 20 | 28 | **88** |
| DuBose | 14 | 16 | 20 | 19 | **69** |

21. King ultimately was offered and accepted the position, effective August 1, 2010. The selection of King was based entirely on how he performed in the interview compared with the other four candidates. Past performance evaluations for the five candidates were not considered at any time during the process, and though some of the interviewers knew some of the candidates, they did not share or discuss any of their outside knowledge of the candidates among themselves at any time during the selection process. The resume review scores were never combined with the interview scores, though if they had been, King still would have scored the highest.

22. At the time the decision was made to hire King, **Vega and McMahon did not know that DuBose had previously complained of discrimination by the Army**.[5] With no prior knowledge of her 2008 EEO complaint, Vega and McMahon nonetheless both ranked King first and DuBose last. In fact, the *highest* score DuBose received in the interview round came from Beussink.

23. At the conclusion of the selection process, the Army documented its reasons for selecting King over the other candidates. Here is the official documented reason why King was selected:

> Bryan King was the unanimous choice of all four panel members. He possessed a functional understanding of the applicable programs and has extensive experience managing them given the fact that he has been the acting supervisor. His technical expertise and background is exceptional and his understanding of how the systems work separated him from the other applicants. He has demonstrated leadership ability, understands the USTC staff and the IT portfolio and he knows how the programs fit into the larger DOD picture and why they are important. He has experience briefing senior leaders and his communications skills are excellent.

---

[4] In preparation for trial, it was discovered that Vega had made inexplicable mathematical errors when adding up his scores for each candidate. His final totals should have been 30 for King, 26 for Little, 25 for Douglas, 22 for Lovejoy, and 18 for DuBose. Wolosz also made a mistake when adding, and his final score for Douglas should have been 26. Taking into account those errors, the adjusted final scores would have been King (118), Little (112), Douglas (90), Lovejoy (89), and DuBose (73). Accordingly, the math mistakes had no impact on the final rankings.

[5] Beussink was aware of the plaintiff's prior EEO activity. It is unclear whether Col. Wolosz knew, or whether he found out afterward.

24. Here is the official documented reason why DuBose was not selected:

> Rose DuBose (the only current SDDC employee interviewed but not selected) was rated last of the five interviewed. When questioned about experience in areas that fall under the Programs and Technology Division, she spoke mainly about work she had done 15+ years ago. She was very hesitant when answering questions about leadership and stated that she did not have much experience dealing with strategic organizations external to SDDC. Additionally her administrative / budget and briefing experience, particularly with senior leaders, was limited. Her understanding of SDDC, especially WRT the organization's role as part of a larger DOD effort, as well as the scope and effect of the IT programs in a larger sense was lacking.

25. Handwritten notes taken by the panel members during the interviews support these explanations. For example, Col. Wolosz noted that DuBose was "hesitant" and "didn't aggressively answer." Many of her answers, he wrote, were "dated" and expressed "negative overtones" about her current position. Vega wrote that she failed to provide enough "specific examples" about her work experience. DuBose herself acknowledged later that she did not adequately explain her experience, particularly with regard to budgets. Mere hours after her interview ended, DuBose sent Beussink a long email intended to supplement her answers, explaining that "[t]here were items and actions that I should have elaborated more."

## IV. LEGAL STANDARD

The anti-retaliation provision of Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against its employee because the employee "has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a) (2012); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). "An employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)).

To prevail on a retaliation claim, a plaintiff must prove by a preponderance of the evidence that (1) she opposed an unlawful employment practice; (2) she suffered an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice. *Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 787 (7th Cir. 2012). Title VII retaliation claims "must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, -- U.S. --, 133 S. Ct. 2517, 2533 (2013). An employee must prove that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* In the promotion context, this means that the plaintiff must show she would have been awarded the position had it not been for her prior protected activity. See *Hall v. Forest River, Inc.*, 536 F.3d 615, 621-22 (7th Cir. 2008).

To establish a causal link, plaintiffs can rely on direct or circumstantial evidence. *Castro v. Devry University, Inc.*, 2015 WL 2231823 at *3 (7th Cir. 2015). Direct evidence "typically requires an admission by the employer of discriminatory animus." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015) (citing *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir.2008)). Causation may be established using circumstantial evidence if "'a convincing mosaic of circumstantial evidence' would permit a reasonable trier of fact to infer retaliation by the employer." *Castro*, 2015 WL 2231823 at *3 (quoting *Rhodes v. Illinois Dept. of Trans.*, 359 F.3d 498, 504 (7th Cir. 2004)). Recognized categories of circumstantial evidence include "(1) evidence of suspicious timing, (2) evidence that similarly situated employees were treated differently, and (3) evidence that the employer's proffered reason for the adverse employment action was pretextual." *Id.* (citing *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012)).

(1) Suspicious timing. Although the Seventh Circuit has rejected any bright-line rule about how close the events must be to raise an inference of suspicious timing, the court has also held that a span of one year between the protected activity and the adverse employment action is "certainly not close enough." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014). Moreover, while it may support a finding of causation, the mere fact that one event preceded another does not establish causation. *Burks v. Wisconsin Dept. of Trans.*, 464 F.3d 744, 758-59 (7th Cir. 2006). This general principle is especially true when the claimed retaliation is the failure to promote, because the timing of a promotion is controlled by current or forthcoming vacancies which are beyond an employer's control. *Hall*, 536 F.3d at 622. Thus, a plaintiff must do more than merely point to the temporal link; rather, the plaintiff must put forth other evidence that suggests that the employer's decision was related to the protected activity. *Id.*

(2) Different treatment. To be similarly situated, an employee "must be directly comparable to the plaintiff in all material respects, which is a common-sense, flexible analysis of relevant factors." *Cung*, 751 F.3d at 504 (citations omitted). The "comparators must be similar enough that any differences in their treatment cannot be attributed to other variables." *Silverman*, 637 F.3d at 742 (citations omitted).

(3) Pretextual reasons. To show pretext, the employee must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [employer's] asserted reason that a reasonable person could find [it] unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). The issue is "not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the [adverse employment action]." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "[T]he only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.*

## V. LEGAL ANALYSIS

The plaintiff will be unable to meet her burden of proving by a preponderance of the evidence that the Army chose not to hire her for the position in issue because of her prior EEO activity. Although the defendants are not contesting the first two elements of the claim – that she engaged in protected activity and subsequently suffered an adverse employment action – the

Army denies that the two events have any relationship to each other. At trial, DuBose will not be able to show – as she must – that she would have been selected for the position had she not previously complained about discrimination.

### A. No Direct Evidence

DuBose has no direct evidence of retaliatory animus. She will offer at trial the testimony of Patricia Glover-Black, who in 2009 allegedly overheard Cpt. Little, then the head of Rose's department, make the comment, "We don't want Rose out here." But Little had no role in the hiring process in 2010 (he was himself a candidate for the position), and there is no evidence that Col. Wolosz or anyone else on the hiring panel shared his sentiment. Furthermore, the statement is ambiguous and makes no clear connection to the plaintiff's prior EEO activity. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003) ("[B]efore seemingly stray workplace remarks will qualify as... evidence of discrimination..., the plaintiff must show that the remarks were related to the employment decision in question.") (internal marks omitted) (quoting *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727 (7th Cir. 1998)). Even if his comment could be attributed by agency to SDDC, there could have been any number of legitimate reasons why management at the time did not want Rose to come to Scott AFB. The statement itself does not permit an inference of retaliation on account of the plaintiff's EEO complaint.

DuBose will cite the deposition testimony of Judith Beussink, who admitted feeling in 2008 that DuBose did not deserve to be promoted to a GS-15 position as part of her EEO settlement: "I just didn't... feel the position she was in at Fort Eustis was a GS-15 position." But Beussink also testified that her feelings did not affect how she rated DuBose during the selection process in 2010. Her testimony in that regard is corroborated by the fact that DuBose received her highest interview score from Beussink.[6] Even if the jury could be persuaded that Beussink bore some ill will toward DuBose, there is no evidence that Beussink's feelings about DuBose were ever shared with any of the other panel members. All four of the panel members will testify that they based their decision entirely on the interview scores, and no one injected any outside knowledge of any of the candidates into the discussion.

### B. No Circumstantial Evidence

Nor does DuBose have circumstantial evidence of retaliation. The timing is not at all suspicious. The Seventh Circuit has held that a span of one year is too long to raise an inference of causation. *See Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014); *Porter v. City of Chicago*, 700 F.3d 944, 957-58 (7th Cir. 2012); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("20 months later suggests, by itself, no causality at all."). Here, the adverse employment action took place nearly two years after the protected activity, and during that intervening time, Beussink gave DuBose a positive performance evaluation, resulting in a pay increase and a bonus.

---

[6] DuBose makes much out of the fact that Beussink scored her resume lower than ten other applicants, but it is uncontroverted that the resume scores were used only to determine which candidates to interview, and DuBose was granted an interview. Therefore, the score Beussink gave her resume had no impact on the panel's ultimate selection decision. Any suggestion that the score is evidence of retaliatory animus is blunted by the fact that Beussink (1) scored all of the resumes more harshly than the other two panel members; (2) articulated legitimate, non-discriminatory reasons for the score she gave; and (3) issued DuBose her highest interview score.

DuBose cannot make her case by comparing herself to other similarly situated candidates. All of the candidates for the position were subjected to the same process, the same interview questions, and the same scoring criteria. In addition to DuBose, the panel rejected three other interview candidates who had no history of EEO activity.

The Army has articulated legitimate, non-discriminatory reasons for choosing King. DuBose will attempt to establish that the Army's stated reasons were pretextual by trying to show that she was the most qualified candidate for the position. But "where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless the plaintiff's case demonstrates that those qualifications are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002). In other words, it is not enough that the plaintiff believes she was more qualified than King; she must show that the Army did not honestly believe that King was more qualified, either. *See id.* at 1175 ("The question is not whether the employer properly evaluated the competing applicants, but whether the employer's reason for choosing one candidate over the other was honest."). DuBose cannot meet that burden.

All that DuBose has to support her case is speculation. That is not enough to send the case to a jury, and at the close of the plaintiff's case, the defendants will ask this Court to grant them judgment as a matter of law pursuant to Federal Rule 50. *See generally Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862-63 (7th Cir. 2007).

## VI.   TRIAL STATUS

Trial is scheduled to begin with jury selection at the federal courthouse in East St. Louis, Illinois, at 9:00 a.m. on Tuesday, June 16, 2015. The parties initially anticipated that the trial would last four days, but after recent consultations, the defendants believe the trial could be completed in just two days.

## VII.   WITNESSES

The defendants anticipate that the following ten witnesses will be called by the parties during the trial:

1. Judith Beussink (by deposition)
2. Donald Broadbent
3. Rose DuBose
4. Patricia Glover-Black
5. Bryan King
6. Carolyn Hope McMahon
7. Darren Mims (by deposition)
8. Barbara Toennies
9. David Vega
10. Stanley Wolosz

Beussink is currently burdened by medical problems, and the parties have agreed to present her testimony by deposition.  Mims is out of the country and unavailable to testify, and so his deposition will also have to suffice.  Barbara Toennies is an employee of SDDC's human resources department, and she will be called on to explain SDDC hiring policies, as well as some of the documents in the plaintiff's personnel file.  The parties have each reserved the right to call rebuttal witnesses, and the defendants anticipate that, depending upon the testimony of Rose DuBose and Patricia Glover-Black, they may also call Robert Little as a witness.

David Vega had a family emergency and is currently in Puerto Rico.  The defendants expect him to return in time to testify in person at the trial.  If that proves impossible, the defendants have made arrangements for Vega to testify via live video-teleconference from the United States District Court for the District of Puerto Rico in San Juan.  The plaintiff's counsel has been consulted and consents to this alternative, if necessary.

The defendants will move for the exclusion of all witnesses until their testimony has been completed.  *See* Fed. R. Evid. 615.

## VIII.   EVIDENTIARY ISSUES

The parties have agreed to pre-admit the exhibits listed in the Court's final pretrial order, and the defendants intend to use some of the exhibits during opening statements.  The defendants do not anticipate any objections to any of the deposition testimony that might be offered but nevertheless reserve the right to object at trial where appropriate.

The parties will confer in advance of trial to determine the extent to which they can reach stipulations of fact.  The defendants will address proposed stipulations in good faith and with an eye to judicial economy.

The defendants have previously submitted four motions in limine:

Doc. 56 –   To Exclude the Hearsay Testimony of Patricia Glover Black (*denied*);
Doc. 57 –   To Preclude the Plaintiff from Arguing that the Settlement of her Prior Discrimination Complaint is Evidence of Wrongdoing (*granted*);
Doc. 58 –   To Exclude the Hearsay Testimony of Erma Garland (*granted*);
Doc. 59 –   To Exclude the Opinion Testimony of Darren Mims (*granted*).

This case originally included three other claims of unlawful discrimination, based on race, age, and disability.  The Court dismissed those claims in connection with its summary judgment ruling (*see* Doc. 35).  To the extent that DuBose may seek to raise issues of discrimination on any of those bases, the defendants will object, citing Rules 402 and 403 of the Federal Rules of Evidence.

## IX.   CONCLUSION

The foregoing is a summary of facts and issues the defendants anticipate at trial.  Should any legal issues arise that have not been covered in this trial brief, the defendants respectfully request leave to submit such further memoranda as may be necessary.

Respectfully submitted this the 15th day of June, 2015.

        STEPHEN R. WIGGINTON
        United States Attorney

        *s/ Nathan D. Stump*
        NATHAN D. STUMP
        Assistant United States Attorney
        9 Executive Drive
        Fairview Heights, Illinois 62208
        Tel: (618) 628-3700
        Fax: (618) 628-3720
        Email: nathan.stump@usdoj.gov

        Attorneys for the Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROSE DUBOSE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civ. No. 3:12-cv-789-DGW |
| | ) |
| JOHN M. MCHUGH, *et al*., | ) |
| | ) |
| Defendants | ) |

## CERTIFICATE OF SERVICE

I, Nathan D. Stump, Assistant United States Attorney, hereby certify that on this the 15th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically serve a copy upon all counsel of record, including James H. Shoemaker, Jr., Esq., counsel for Plaintiff.

*/s/ Nathan D. Stump*
NATHAN D. STUMP
Assistant United States Attorney
9 Executive Drive
Fairview Heights, Illinois 62208
Tel: (618) 628-3700
Fax: (618) 628-3720
Email: nathan.stump@usdoj.gov